

**U.S. Department of Justice**

Antitrust Division

---

*Steven Tugander*
*Trial Attorney*

*Direct Dial: 212-335-8032*
*E-mail:steven.tugander@usdoj.gov*

*New York Field Office*

*26 Federal Plaza*              *212/335-8000*
*Room 3630*
*New York, New York 10278-0140*   *FAX 212/335-8043*

April 29, 2014

The Honorable Harold Baer
United States District Court
Southern District of New York
500 Pearl Street,
New York, New York 10007

Re:  *United States v. Douglas Goldberg, 10-CR-209 (HB)*

Dear Judge Baer:

The Government respectfully submits this letter pursuant to § 5K1.1 of the United States Sentencing Guidelines (hereinafter "§ 5K1.1") to provide the Court with the details surrounding the substantial assistance that Defendant Douglas Goldberg has provided to the Government in its investigation and prosecution of bid rigging and fraud in the municipal bonds industry. Because Defendant Goldberg has substantially assisted the Government's investigation for more than seven years, the Government will request at the time of sentencing that the Court sentence the Defendant in light of the factors set forth in § 5K1.1(a)(1)-(5) and thereby depart from the Guidelines. Defendant Goldberg is scheduled to be sentenced on May 8, 2014.

## I.  Background

The Information in this case was filed on March 15, 2010. It charges one count of violating 15 U.S.C. § 1, one count of violating 18 U.S.C. § 371 (with the objects of violating 18 U.S.C. § 1343 and to defraud the IRS) and one count of violating 18 U.S.C. § 1343. On March 15, 2010 Defendant Goldberg pleaded guilty to each of the three above-referenced charges pursuant to a plea and cooperation agreement filed the same day.

## II.  Defendant Goldberg's Conduct

Defendant Goldberg worked for CDR throughout the relevant period. CDR was one of the oldest and largest brokers of municipal investment agreements in the United States. David Rubin was the company's founder, chief executive officer, managing director and sole owner. As sole owner, Rubin received the vast majority of the firm's profits. Zevi Wolmark was employed by CDR as its chief financial officer and managing director. Lower level employees

*Letter to Judge Baer - United States v. Douglas Goldberg: Request for 5K Departure*

including Defendant Goldberg, Dani Naeh, Matthew Rothman and Evan Zarefsky, conducted bidding on behalf of CDR and reported to Rubin and Wolmark.

Defendant Goldberg's employment with CDR began in 1994 and continued until 2006, when he resigned from CDR to take a position with Deutsche Bank. During the period of time that he was employed by CDR, Defendant Goldberg worked in CDR's municipal reinvestment business and had responsibility for conducting bids. Defendant Goldberg was a salaried employee, with the exception that he received commissions on CDR-brokered Bank of America underwritten transactions, pursuant to an arrangement that he reached with Dani Naeh.

Count One charged Defendant Goldberg with participating in a conspiracy to rig bids from 1998 to 2006. Specifically, Defendant Goldberg, CDR and various co-conspirator providers entered into an agreement whereby the co-conspirators arranged which providers would win contracts in advance of the bidding. More specifically, Defendant Goldberg and CDR often arranged for the provider that was serving as the underwriter on the underlying bond issue to be the winner.[1] As part of the agreement, the designated winning bidder often provided Defendant Goldberg and others at CDR with the bid rate at which it desired to win, and Defendant Goldberg and CDR would then provide the rate to other conspirators, with the understanding that they would bid less competitively than the winning bidder's desired rate. Accordingly, providers that were designated to lose particular contracts submitted intentionally non-competitive bids to CDR. Moreover, on many occasions CDR took steps to further reduce competition by limiting bid lists to conspiring providers and other bidders that could not reasonably compete. The conspiracy was designed to and did allow conspiring providers to win bids at artificially increased profit levels. Following the award of bids, CDR and various co-conspirator providers submitted numerous written misrepresentations, falsely certifying that the bidding had been conducted in a *bona fide* manner, and in accordance with procedures outlined by the relevant Treasury regulations. In most cases, the false certifications that were submitted by CDR were signed by Defendant Goldberg.[2]

In exchange for CDR's manipulating the bidding process to favor particular providers, Defendant Goldberg and other CDR employees arranged for CDR to be paid kickbacks that were sometimes disguised as legitimate broker fees on other, seemingly unrelated transactions. Defendant Goldberg received commissions on kickbacks that were paid by one provider, Bank of America, pursuant to an arrangement that he reached with CDR employee, Dani Naeh. Because he received a commission of approximately ten percent of all revenue generated by Bank of America, Defendant Goldberg had a financial incentive to rig bids in favor of Bank of America at artificially increased profit levels and to seek kickbacks.

There were at least ten providers that participated in the charged bid–rigging conspiracy with CDR, including Bank of America ("BOA"), JP Morgan (later JPMorgan Chase), UBS, First Union (later Wachovia), Bear Stearns, Lehman, Société Générale, SunAmerica, GE and FSA.

---

[1] The underwriter was often the financial institution that had recommended to the municipality that it hire CDR to act as broker.

[2] CDR's owner David Rubin designated Defendant Goldberg as a CDR corporate officer so that he could sign bid certification documents.

*Letter to Judge Baer - United States v. Douglas Goldberg: Request for 5K Departure*

During the course of its investigation, the Government has identified that between 1998 and 2006, approximately 210 separate investment agreements for approximately 103 issuers were subject to the bid-rigging conduct.

Count Two charged Defendant Goldberg with conduct that he engaged in with employees of FSA, a provider of investment agreements. Specifically, Defendant Goldberg and other CDR employees steered investment agreements to FSA by disclosing improper, confidential information that allowed FSA to win bids for investment agreements at artificially determined and suppressed interest rates. In addition, Defendant Goldberg and other CDR employees frequently requested and received intentionally losing "courtesy" bids from FSA. These intentionally losing bids made it appear to municipalities and the IRS that FSA had competed for particular investment contracts, when in fact it had not. Following the award of bids, Defendant Goldberg, CDR and FSA submitted numerous written misrepresentations, falsely certifying that the bidding had been conducted in a *bona fide* manner, and in accordance with procedures outlined by the Treasury regulations.

In exchange for CDR's manipulating the bidding process to favor FSA, Defendant Goldberg and CDR arranged for CDR to be paid kickbacks that were disguised as legitimate "hedging" or "swap brokerage" fees.[3]  FSA paid approximately nine such kickbacks totaling $707,600[4] to CDR, although the actual physical payments to CDR were made by co-conspirators UBS and Royal Bank of Canada ("RBC"). The nine or so kickback payments were associated with investment agreements for approximately seven bond issues that CDR steered to FSA by manipulating the selection of providers asked to bid and, in many instances, allowing FSA to lower its initial bid.

During the course of its investigation, the Government has identified that between 2001 and 2006, investment agreements associated with approximately 62 separate bond issues were subject to the conspiracy charged in Count Two. Of these, approximately fourteen were bond issues that were also subject to the bid-rigging conspiracy charged in Count One. FSA won approximately 33 of the subject investment agreements and submitted intentionally losing bids for approximately 29 of them.

The conduct charged in Count Three, a substantive wire fraud charge, encompasses the same conduct that is charged in Counts One and Two as well as additional conduct involving additional providers, including GE and its employees Dominick Carollo, Steven Goldberg and

---

[3] In conjunction with winning investment agreements, FSA routinely entered into hedging transactions with third party financial institutions in order minimize its interest rate risk. On a number of fraudulent transactions, FSA paid kickbacks to CDR that were disguised as fees paid for brokering these secondary hedging transactions, when in fact the payments were made in exchange for CDR's assistance in manipulating the bidding process. The conspirators took steps to further conceal these payments from detection by arranging for third parties, rather than FSA, to make the "brokerage" payments directly to CDR. FSA would in turn reimburse these third parties for the full amount of the kickbacks.

[4] Of this total, $65,600 in kickbacks was associated with approximately two investment agreements where the bids were rigged as part of the conspiracy charged in Count One.

*Letter to Judge Baer - United States v. Douglas Goldberg: Request for 5K Departure*

Peter Grimm, and some of the same providers involved in the bid-rigging conspiracy. Count Three alleges that as part of the scheme, Defendant Goldberg's co-schemer, FSA, wired an interest payment to one of the numerous municipalities that was victimized by the scheme. During the course of its investigation, the Government has identified that between 1999 and 2006, the scheme charged in Count Three affected approximately 210 separate bond issues.

III.     The Government's Investigation and Prosecutions of the Municipal Bonds Industry

The Information and plea agreement filed in this case resulted from a wide-ranging investigation of bid rigging and fraud related to the municipal bonds industry that began in late 2004. The investigation uncovered fraudulent, anti-competitive behavior by numerous individuals who were employed by bidding agents and major financial institutions. These collusive and fraudulent practices, involving complex financial instruments, affected the bidding for contracts for the investment of billions of dollars of public funds and consequently victimized the United States Treasury as well as countless municipalities located throughout the United States.

To date, fourteen individuals and one corporation have pleaded guilty to antitrust, fraud, and other charges. In addition, five large financial institutions have entered into settlement agreements requiring them to pay approximately $743 million in restitution, disgorgement and penalties. Moreover, six former employees of financial institutions were tried and convicted of multiple counts in the SDNY before Your Honor and Judge Wood.[5] Sixteen defendants have been sentenced to date. As detailed below, Defendant Goldberg's more than seven years of cooperation have substantially assisted the Government in achieving these results.

IV. Defendant Goldberg's Cooperation

A. Background

Defendant Goldberg's counsel approached the Government regarding potential cooperation in November 2006. Counsel's approach occurred immediately after the Government executed a search of CDR's offices in Beverly Hills, California. Prior to the search, the Government's investigation of the municipal bonds industry had been covert, and thus, Defendant Goldberg was unaware that such an investigation existed. At the time of counsel's approach, the Government had been in the process of reviewing a large volume of audio recordings and documents that had been obtained in the investigation. The recordings and documents implicated CDR and several employees, including Defendant Goldberg, in multiple wire fraud and bid rigging conspiracies with numerous individuals and financial institutions. At

---

[5] In November 2013, the Second Circuit Court of Appeals reversed the convictions of three defendants (Dominick Carollo, Steven Goldberg and Peter Grimm) on statute of limitations grounds. Each of these three defendants had been found guilty in May 2012 following a jury trial before Your Honor. In January 2014, the Government filed a motion requesting *en banc* review of the Second Circuit's reversal of the three convictions. The motion is currently pending.

*Letter to Judge Baer - United States v. Douglas Goldberg: Request for 5K Departure*

the time of counsel's approach, one other former CDR employee (Mark Zaino), and one former Bank of America employee (Douglas Campell), had been cooperating in a covert fashion. Mr. Zaino's incriminating information was limited, however, due to the fact that his employment at CDR was relatively brief and his duties and responsibilities within the company were not extensive. Defendant Goldberg, however, was employed by CDR for a lengthy time that included the entire conspiratorial period, and moreover, was involved in virtually all aspects of CDR's reinvestment business. In addition, Defendant Goldberg worked very closely with CDR's owner David Rubin, its Chief Financial Officer Zevi Wolmark and Dani Naeh, a key CDR marketer. As a result, at the time of Defendant Goldberg's approach, the Government was particularly interested in Defendant Goldberg's ability to cooperate and provide direct evidence against Rubin, Wolmark, Naeh, other lower level CDR employees, and a variety of providers with whom Defendant Goldberg maintained close contact during the conspiratorial period. In addition, the Government wanted Defendant Goldberg to help analyze and review the voluminous incriminating recordings and documents it had obtained and anticipated obtaining.

In February 2007, Defendant Goldberg agreed to, and began cooperating in the Government's wide-ranging investigation. Defendant Goldberg's agreement to cooperate included: meeting with the Government whenever it requested; making covert consensual audio recordings of industry participants; providing, reviewing and analyzing industry audio recordings and documents; and testifying at grand jury sessions and trials if necessary. From the Government's perspective, there is no question that Defendant Goldberg has done all that was requested of him and has fulfilled the terms of his cooperation agreement in all respects.

## B. 5K1.1 Factors

Section 5K1.1 sets forth five non-exclusive factors that sentencing courts are encouraged to consider in determining the appropriate sentencing reduction for a defendant who has provided substantial assistance. The application of each of those factors to Defendant Goldberg's cooperation is set forth below.

### 1. The Significance and Usefulness of Defendant's Cooperation

From the time he began cooperating, it became clear to the Government that Defendant Goldberg had a uniquely strong ability to recall specific incriminating events and transactions that occurred at CDR during the conspiratorial period, often doing so without the need to have his recollection refreshed by audio recordings or documents. Moreover, Defendant Goldberg also displayed a uniquely strong ability to explain and simplify many of the numerous complex transactions that were under investigation so that they could be understood by the average lay person. As a result, Defendant Goldberg was of great assistance to the Government in explaining the incriminating recordings and documents the Government had obtained and placing these materials in proper context. In addition, because, as noted above, Defendant Goldberg was employed by CDR for a lengthy period, and was involved in virtually all aspects of CDR's reinvestment business, he provided the Government with direct, incriminating evidence against Rubin, Wolmark, Naeh, other lower level CDR employees, and a number of conspiring providers. Defendant Goldberg was the only cooperating witness who was scheduled

to testify in all four of the Government's indicted cases. Defendant Goldberg's unique ability to explain a highly complicated industry and to detail the underlying criminal conduct proved invaluable to the Government's investigation and prosecutions.

During the course of the investigation, Defendant Goldberg met with the Government on approximately 60 occasions, travelling from California to New York, Chicago and Charlotte, North Carolina, many times at his own expense. In addition, on several occasions, Defendant Goldberg made himself available to the Government via teleconference. During his interview sessions, Defendant Goldberg reviewed voluminous recordings and documents, and, as a result, the Government identified a large number of specific fraudulent transactions that formed the basis of substantial parts of four indictments that were returned during the course of the Government's investigation: *United States v. Rubin/Chambers, Dunhill, Insurance Services, Inc.*, No. 09 Cr. 1058 (S.D.N.Y.) (Marrero, J.); *United States v. Carollo*, No. 10 Cr. 654 (S.D.N.Y.) (Baer, J.); *United States v. Ghavami*, No. 10 Cr. 1217 (Wood, J.) and *United States v. Murphy* No. 3:12-CR-235 (W.D.N.C. Cogburn, J.). Moreover, to the extent that the Government had questions about particular pieces of evidence that it was in the process of analyzing, Defendant Goldberg provided assistance in helping to answer these questions. In addition, Defendant Goldberg provided the Government with substantial background information regarding the inner workings of CDR and other financial institutions, and was particularly helpful in fleshing out the nature of relationships that CDR employees had with various providers. Likewise, covert audio recordings that were made by Defendant Goldberg provided additional information that the Government had not otherwise obtained. Furthermore, Defendant Goldberg spent a substantial amount of time assisting the Government in reviewing and correcting transcripts of audio recordings that were used at trial.

As noted above, partially as a result of Defendant Goldberg's cooperation, four indictments were returned against ten individuals and one corporation. The first, *United States v. Rubin/Chambers, Dunhill, Insurance Services, Inc.*, charged the corporate entity CDR, and three of its employees Rubin, Wolmark and Zarefsky. This indictment resulted in guilty pleas by each of the four defendants shortly before trial was scheduled to commence in January 2012. Defendant Goldberg met with the Government on twenty seven occasions preparing for the *Rubin* trial, and would have testified as a key inside CDR cooperating witnesses against each of the four defendants had the case proceeded to trial. Moreover, Defendant Goldberg would have been called as the Government's first witness, an important designation because it would have required him not only to testify about numerous specific transactions, but also, to provide background on the complex nature of the municipal bonds industry to the jury, thereby providing the foundation for the jury's understanding of subsequent witness testimony, documents and audio recordings that were to be introduced at trial. Defendant Goldberg was expected to testify about at least 30 transactions, which was more than half of the transactions the Government intended to prove at trial, and his testimony provided the only evidence in support of many of these transactions. Defendant Goldberg's testimony would have been particularly important with respect to transactions for which CDR's owner, David Rubin had primary responsibility. It is the Government's belief that each of the four defendant's decision to plead guilty was motivated at least in part, by Defendant Goldberg's decision to testify on behalf of the Government.

*Letter to Judge Baer - United States v. Douglas Goldberg: Request for 5K Departure*

       Shortly after all four *Rubin* defendants pleaded guilty, Defendant Goldberg began meeting with the Government in preparation for the trial of the second indicted case, *U.S. v. Carollo*, which commenced in April 2012. Defendant Goldberg eventually testified in the *Carollo* trial over the course of two days. As would have been the case in *Rubin,* Defendant Goldberg was called as the Government's first witness, which required him to describe the nature of the complex municipal bonds industry to the jury. In addition, during the course of his testimony, Defendant Goldberg provided overview evidence regarding the origins and general workings of the charged conduct, and then provided specific evidence related to six transactions. His testimony regarding the six specific transactions required him to explain and describe a variety of particular audio recordings and documents. The trial resulted in the conviction of all three defendants on multiple counts. In the Government's view, Defendant Goldberg was a valuable witness, who testified effectively and substantially assisted the Government's ability to present incriminating evidence to the jury.

       In July 2012, Defendant Goldberg began meeting with the Government in preparation for the trial of the third indicted case, *U.S. v. Ghavami*, which commenced in late July 2012. Defendant Goldberg eventually testified in the *Ghavami* trial over the course of two days. During his testimony, Defendant Goldberg provided important overview evidence regarding the origins of the corrupt relationships that existed between CDR, UBS and each of the three defendants. Goldberg testified that he attended a meeting between David Rubin, the head of CDR, and Peter Ghavami, the co-head of the UBS municipal reinvestment and external derivatives desk ("MRED") along with Gary Heinz, in which the coconspirators discussed ways that they could work together to profit at the expense of municipalities. Specifically they discussed that Ghavami and Heinz would get CDR hired as a broker by UBS's municipal clients and in turn CDR would help UBS win the transactions in which UBS got CDR hired. Goldberg also testified about e-mail communications between himself, Rubin, Ghavami, and Heinz illustrating that the coconspirators took specific steps to carry out the illegal agreements discussed at the meeting. Goldberg then testified about specific corrupt transactions involving each of the three *Ghavami* defendants. Defendant Goldberg then provided specific evidence related to ten transactions, and testified in detail about each of the defendant's participation in schemes to rig bids and pay kickbacks to CDR. With respect to the kickback testimony, Defendant Goldberg described the ways in which UBS was used as a conduit by CDR and FSA to disguise the kickbacks as swap brokerage fees. Defendant Goldberg testified that Ghavami and Heinz arranged to pay CDR a $200,000 kickback disguised as a swap brokerage fee on a deal in which CDR performed no work and was not a necessary party to the transaction. His testimony regarding the ten specific transactions required him to describe and explain a variety of incriminating materials including bidding documents, false certifications, invoices and e-mails. The trial resulted in the conviction of all three defendants on multiple counts. Defendant Goldberg's testimony was critical to the Government's case because unlike some of the other financial entities involved, neither UBS nor CDR recorded conversations and thus, virtually no audio evidence existed of the corrupt conduct involving CDR and the UBS defendants. In the Government's view, Defendant Goldberg was a valuable witness, who testified effectively and substantially assisted the Government's ability to present incriminating evidence to the jury.

       Beginning in approximately mid-2013 and continuing until January 2014, Defendant Goldberg met with the Government on approximately seven occasions in New York and in

*Letter to Judge Baer - United States v. Douglas Goldberg: Request for 5K Departure*

Charlotte, North Carolina in preparation for his trial testimony in *United States v. Murphy*.[6] Defendant Goldberg's testimony became unnecessary however, when the defendant, Phillip Murphy, a former senior executive at Bank of America, pleaded guilty on the eve of trial. Had the case proceeded to trial, Defendant Goldberg would have testified as a key witness, again serving as the Government's first witness and providing background information about the municipal bonds industry and the inner workings of CDR. Moreover, because Defendant Goldberg had established important relationships with senior executives at Bank of America, including the defendant Phillip Murphy, he would have provided important direct evidence against Murphy. Defendant Goldberg's testimony would have described the genesis of Murphy's corrupt relationship with CDR and would have also detailed specific transactions that were rigged by CDR in favor of Bank of America. For this reason, it is the Government's belief that Murphy's decision to plead guilty was motivated, at least in part, by Defendant Goldberg's decision to cooperate and testify on behalf of the Government.

Moreover, during the course of his more than seven years of cooperation, Defendant Goldberg provided incriminating information against additional uncharged industry participants including numerous individuals and corporations. For a variety of reasons, the Government did not file charges against these additional potential defendants. Nonetheless, Defendant Goldberg spent many hours discussing the conduct of these uncharged subjects, and stood willing to testify at trial if needed.

### 2. The Defendant's Truthfulness, Completeness and Reliability

During the time period that he has cooperated, Defendant Goldberg has been truthful, complete and reliable. In the Government's view, Defendant Goldberg has strived to be as helpful and cooperative as possible. Defendant Goldberg did not attempt to shade the truth or provide information beyond his knowledge. Nor did it appear to the Government that Defendant Goldberg ever attempted to withhold information, or protect particular individuals or corporations. As noted above, the Government was particularly impressed with Defendant Goldberg's ability to recall specific transactions and events that were the subject of the Government's investigation. Moreover, Defendant Goldberg was reliable not only in his efforts to provide truthful information, but also by making himself available to the Government whenever he was needed. Furthermore, Defendant Goldberg cooperated for more than three years without a written plea and cooperation agreement with the Government.

### 3. The Nature and Extent of the Defendant's Assistance

As noted above, Defendant Goldberg has been cooperating with the Government's investigation since approximately February 2007, shortly after the Government's investigation became overt. During this time, he has met with the Government approximately sixty times, including meetings with DOJ and SEC attorneys, FBI and IRS agents, and paralegals. Most of

---

[6]Because the court granted defense counsel a one week adjournment after jury selection due to defense counsel's illness, Defendant Goldberg spent nine days in Charlotte making himself available to the Government as necessary.

*Letter to Judge Baer - United States v. Douglas Goldberg: Request for 5K Departure*

these meetings required Defendant Goldberg to travel from California to New York for several days at a time.  As part of his cooperation efforts, Defendant Goldberg reviewed large volumes of audio recordings and documents, made consensual covert recordings and helped the Government draft transcripts.  Defendant Goldberg also performed a substantial amount of work for the Government outside of its presence.  In short, Defendant Goldberg has done everything that has been asked of him by the Government.

### 4.   The Timeliness of the Defendant's Assistance

Defendant Goldberg provided timely assistance that allowed the Government to quickly advance its investigation.  As described above, Defendant Goldberg's counsel approached the Government and offered to cooperate in November 2006, immediately after the Government's investigation became overt.  When Defendant Goldberg began cooperating, the Government's investigation was at a relatively early stage and additional witnesses were needed.  Defendant Goldberg was the second defendant to plead guilty in the municipal bonds investigation and his cooperation allowed the Government more than ample time to prepare the four above-referenced indictments that were returned in 2009, 2010 and 2012, and to prepare for four trials.

### 5.   Risk of Injury

Although the Government has no reason to believe that Defendant Goldberg was ever in physical danger as a result of his cooperation, the covert recordings that he made subjected him to potential scorn from colleagues, friends and business associates.  Moreover, because he was the second defendant to plead guilty in the municipal bonds investigation, Defendant Goldberg was the subject of negative publicity earlier than all but one other defendant.

V.  <u>Conclusion</u>

Because as described above, Defendant Goldberg has now cooperated in the Government's investigation and prosecutions for more than seven years, the Government respectfully submits that he has provided "substantial assistance" as that term is defined by the Sentencing Guidelines.  Therefore, assuming that Defendant Goldberg continues to comply with the terms of his plea and cooperation agreement, the Government will request on May 8, 2014, that the Court impose a sentence on Defendant Goldberg that departs from the Guidelines, pursuant to § 5K1.1.

Respectfully submitted,

STEVEN TUGANDER
Trial Attorney
Antitrust Division

cc:  Kenneth Barish, Esq. (By E-Mail)
     Selwyn Foderingham, Jr. Sr. U.S. Probation Officer (By E-Mail)